**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DEMETRIUS COLEMAN,** | ) | |
| **PAMELA BROOKS,** | ) | |
| **DELANO PORCHIA, and** | ) | |
| **CAMILLE BRITTON** | ) | **Civil Action No. 3-13-CV-0021** |
| | ) | **Magistrate Judge Frensley** |
| **V.** | ) | |
| | ) | |
| **PARALLON ENTERPRISES INC.** | ) | |
| **Formerly known as HSS SYSTEMS, LLC.** | ) | |

## MEMORANDUM

Defendant, Parallon Enterprises, Inc. ("Parallon") has filed Motions for Summary Judgment as to the named Plaintiffs (Docket Nos. 48, 51, 54 and 57), to which Plaintiffs have filed a consolidated Response in Opposition (Docket No. 87-1), and Parallon filed replies (Docket Nos. 93, 95, 97 and 99). For the reasons stated herein the motions will be GRANTED.

## BACKGROUND

### A.  Procedural History

Each of the Plaintiffs was employed by Parallon in a division known as the Provider Enrollment Department. The Plaintiffs contend that discriminatory practices and policy enforcement by management resulted in the creation of a hostile work environment ultimately changing the racial demographics of the entire department from majority African American to majority Caucasian following a statement made by the department director of his intention to "change the face of provider enrollment" in 2010. From 2011 through 2012, Plaintiffs contend that 100% of the terminated employees were African American including the Plaintiffs who were terminated for various reasons. Plaintiffs allege that their terminations were discriminatory and

as evidence point in part to the statement of "changing the face of the department." Parallon has moved for summary judgment on all Plaintiffs' claims.

## B.    Facts

The Plaintiffs were all employees of the Provider Enrollment Department which is a division of Defendant Parallon that assists healthcare providers to enroll with insurance companies, Medicare and Medicaid to receive compensation for services provided through programs of those payment entities. During the Plaintiffs' employment the Provider Enrollment Department was split into divisions grouped by states. Each group had a manager, two or three Enrollment Coordinator Team Leads ("Team Lead") and multiple Credentialing Specialists. The manager had overall responsibility for the division while the team leads were responsible for a subset of states or processes within the division and the Credentialing Specialists prepared and submitted credentialing applications and supporting documentation in order to enroll physicians and physician groups with payers.

In the fall of 2008, Dennis Cook, became the Director of Provider Enrollment. At that time, the workforce of the department was 70% African American. In late 2010, Mr. Cook declared a department initiative to "change the face of provider enrollment." In the two years subsequent to that statement each of the Plaintiffs were terminated though Mr. Cook was not involved in the decision to terminate all of the Plaintiffs' employment.

### 1.    Camille Britton

Camille Britton, an African American female, was hired on February 7, 2006 as a Credentialing Specialist in the Provider Enrollment Department. She was promoted to the position of Team Lead on October 8, 2009. From 2006 until 2009, Ms. Britton reported to three different managers. During that time she was repeatedly counseled regarding unscheduled

2

absences and tardies and disciplined seven times for failing to correct the pattern. She received two final written warnings and was placed on a Performance Improvement Plan ("PIP") all related to her attendance issues. In 2012, she reported to another supervisor who issued additional disciplinary action for attendance problems. During this time, the Defendant allowed Ms. Britton to change her schedule on multiple occasions to address her attendance issues.

In late 2010, Britton began reporting to a new manager. On January 4, 2011, she was issued a final written warning and three day suspension for an unscheduled absence in violation of her work schedule agreement from October 2010. Following her employee performance review in March 2011, again noting concerns about attendance; at Britton's request the Defendant agreed to modify her work schedule. On August 3, 2011, Britton was issued her fourth final written warning for attendance issues but she continued to have attendance problems culminating on November 3, 2011 when she was again late to work.

In March 2011, Ms. Britton was approved for intermittent FMLA leave related to the health of her son. That leave was granted by the defendant and utilized by Ms. Britton on multiple occasions. On November 3, 2011, Ms. Britton sent her manager an email stating the following:

> Will you please clock me in at 9:10? My Kronos was locked out this morning. I also called you because I was caught in traffic on the exit ramp.

On November 4, 2011 Ms. Britton's manager recommended her termination to the Director of Provider Enrollment, Dennis Cook, and the Human Resources Manager both of whom agreed with the recommendation and Ms. Britton was terminated based on her pattern of poor performance not corrected through various counselings, schedule changes and prior disciplinary action.

## 2. Pamela Brooks

Pamela Brooks, an African American female, was hired in 2006 and was promoted in 2009 to a Team Leader positon. Prior to her promotion she was rated as "needs improvement" in the category of "teamwork" on her annual performance review. In her first evaluation after becoming a Team Leader, she again revived a rating of "needs improvement" this time in the area of "completes work in a timely manner." Following a restructuring in 2010, Ms. Brooks received a new supervisor who had concerns with the manner in which Ms. Brooks communicated in person and by email with her subordinates. Brooks received several disciplinary actions culminating in a final written warning on June 17, 2011 for sending confidential and sensitive information to other employees by email. She received an overall rating of "needs improvement" on her July 20, 2011, performance review. Despite acknowledging the concerns of her supervisors and committing to meeting the job expectations, Ms. Brooks received final warning and three day suspension on January 17, 2012, as a result of two incidences occurring in December and January wherein she took positions with and made statements to non-supervisory employees that were inconsistent with the goals and objectives of the company and undermined management. Brooks continued to exhibit a lack of leadership and good judgment ultimately resulting in her supervisor recommending her termination to the then director of Provider Enrollment, Amie Hamtil and Director of Human Resources, Kathyrn Mastin, both of whom agreed with the recommendation. Ms. Brooks was terminated for failing to demonstrate good judgment and leadership, failing to improve the work environment and unprofessional and ineffective communication skills.

### 3. Demetrius Coleman

Demetrius Coleman, an African American female, was hired by Parallon in 2004 as a Credentialing Specialist. She was promoted to a Team Lead position in 2008 and ultimately

selected for special assignment as the Medicare Team Leader. Ms. Coleman's annual performance review in 2005 rated her as "needs improvement" in the areas of "business ethics" and "teamwork." Her then manager, Shelia Chappell, an African American, indicated that Ms. Coleman "need[ed] to manage her anger better," "need[ed] to be cautious with her behavior and more reasonable, less disrespectful for policies and standards, and towards management," and "[needed to] have a professional relationship with her peers and management and remove intolerance she might have toward them due to issues she has with them personally."

Upon her promotion in 2008 to the position of Team Lead, Ms. Coleman's then manager rated her as "needs improvement" in the area of "gives and welcomes feedback" indicating she lacked skills in giving constructive feedback and needed to continue to work on delivery of coaching, and maintaining a professional approach in dealing with errors found in the department. Following her 2008 annual performance review, several employees complained about her management-style and in early 2010, her supervisory responsibilities were taken away from her though she experienced no change in title, pay or benefits. Notwithstanding her prior difficulties with supervision, her supervisor in 2010, Provider Enrollment Manager, Shirley Roberts, gave her a special assignment as the Medicare Team Lead. In July of 2010, Roberts gave Coleman a performance review noting concerns with Coleman's workplace behavior and interactions with other employees. Coleman received another performance review in September of 2010 with additional concerns regarding her interaction with other employees. Following that review, Roberts continued to have concerns with Coleman's workplace behavior and professionalism. Roberts continued to coach Ms. Coleman but nonetheless still received complaints from employees regarding Ms. Coleman's unprofessional behavior and management style.

In January 2012, Roberts was advised by another manager that Coleman had openly celebrated the Department Director's reassignment advising staff that the director was demoted and that the new director would discover that Ms. Roberts was incompetent and she would be gone as well. Three days later, after asking Ms. Coleman to explain while she had missed an enrollment related conference call  Coleman's response which included pointing her finger at Roberts and yelling at her in front of other employees, resulted in Roberts feeling threatened by Coleman. As a result, Roberts recommended Coleman's termination to the Director of Provider Enrollment, Dennis Cook and Director of Human Resources both of whom agreed with the recommendation resulting in Coleman's termination.

### 4.    Delano Porchia

Delano Porchia, an African American male, was hired by Defendant on June 25, 2007 as a Credentialing Specialist. In his annual performance review in 2008, Porchia was rated by his then African American supervisor as "needs improvement" in the area of "quality" noting that his work was at times less accurate and thorough than required, that he did not always apply the feedback he received to improve performance or adequately monitor his work. After voluntarily resigning his employment in 2008, Mr. Porchia was rehired in February of 2009. In December 2009, he was placed on a Performance Improvement Plan by his new manager who was also African American, for failing to meet the department productivity benchmarks. In 2010, Ms. Roberts became Mr. Porchia's manager and noted in his September 2010 performance review that he continued to not meet productivity standards and have problems with accuracy in his records.   In February 2011, Mr. Porchia was issued another employee performance review continuing to note his failure to meet departmental standards in productivity and while he made some improvements in his day to day productivity he continued to have issues with follow up

and inaccuracy in his records. In March 2012, Roberts issued Mr. Porchia a written warning and three day suspension for continuing to work below productivity and quality standards and ultimately placed him on a Performance Improvement Plan. Based upon Mr. Porchia's failure to achieve the productivity and quality expectations set out in the performance plan, Roberts recommended Mr. Porchia's termination to Director of Provider Enrollment, Amie Hamtil and Director of Human Resources, who agreed with the recommendation. On May 8, 2012, Mr. Porchia was terminated for failing to successfully complete his PIP.

<u>ANALYSIS</u>

**A.    Relevant Legal Standards**

1**. Motion for Summary Judgment**

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  A dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for summary judgment, the moving party must meet the burden of proving the absence of a genuine issue as to material fact concerning an essential element of the opposing party's claim.  *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).  In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party.  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial. If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273. When this occurs, the moving party is entitled to summary judgment as a matter of law. *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

### 2. Title VII of the Civil Rights Act

Title VII of the Civil Rights Act of 1964 protects employees from discrimination on the basis of an individual's race, color, religion, sex, or national origin, and provides, in part:

It shall be an unlawful employment practice for an employer–

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2.

A prima facie claim of race discrimination under Title VII requires a plaintiff to establish the following: (1) He or she is a member of a protected class; (2) He or she was qualified for the job and performed it satisfactorily; (3) Despite his or her qualifications and performance, he or

she suffered an adverse employment action;[1] and (4) He or she was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside the protected class. *Johnson v. Univ. of Cincinnati*, 215 F. 3d 561, 572-73 (6th Cir. 2000). *See also Perry v. McGinnis*, 209 F. 3d 597, 601 (6th Cir. 2000). (Footnote added.)

A plaintiff may establish a claim of discrimination under Title VII either by introducing direct evidence of discrimination, or by proving circumstantial evidence that would support an inference of discrimination. *Johnson v. Univ. of Cincinnati*, 215 F. 3d 561, 572 (6th Cir. 2000), *citing Kline v. Tennessee Valley Auth.*, 128 F. 3d 337, 348 (6th Cir. 1997). "The direct evidence and the circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Id.* If the Plaintiff lacks direct evidence of discrimination, the circumstantial evidence approach is used and the *McDonnell Douglas-Burdine* tripartite test is employed. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), as later clarified by *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981).

### 3. 42 U. S. C. § 1981 and the Tennessee Human Rights Act ("THRA")

The standard for evaluating claims of intentional discrimination under § 1981 is the same as that used under the THRA and Title VII. *See Johnson v. University of Cincinnati*, 215 F. 3d 561, 573 (6th Cir. 2000); *see Lynch v. City of Jellico*, 205 S. W. 3d 384, 399 (Tenn. 2006).

### 4. Family and Medical Leave Act - 29 U. S. C. § 2601, et seq.

The Family and Medical Leave Act ("FMLA") entitles an eligible employee to as many as twelve weeks of leave during any twelve-month period if the employee has a "serious health

---

[1] An adverse employment action is one that causes a materially adverse change in a term of employment, such as significantly diminished responsibilities, termination, a demotion evidenced by a decrease in wage or salary, a less distinguished title, or a material loss of benefits. *See Kocsis v. Multi-Care Mgmt. Inc.*, 97 F. 3d 876, 885-86 (6th Cir. 1996).

condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The statute defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." *Id.* at § 2611(11). An employee seeking to use his or her FMLA leave must notify the employer that FMLA-qualifying leave is needed. *Arban v. West Publ'g Corp.,* 345 F.3d 390, 400 (6th Cir. 2003); *Brohm v. JH Props., Inc.,* 149 F.3d 517, 523 (6th Cir. 1998).

There are two separate theories of recovery under the FMLA: the "interference" theory and the "retaliation" theory. *Hoge v. Honda of Am. Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir. 2004). The "interference" theory is based on 29 U.S.C. § 2615(a)(1), which states that employers cannot "interfere with, restrain, or deny the exercise of or attempt to exercise, any right provided" by the FMLA. In order to state an FMLA interference claim, a plaintiff must show that: (1) he or she was an eligible employee; (2) the defendant was an employer subject to the FMLA; (3) he or she was entitled to leave under the FMLA; (4) he or she provided the defendant with notice of intention to take FMLA leave; and (5) the defendant denied the plaintiff FMLA benefits to which he or she was entitled. *Romans v. Mich. Dep't of Human Servs.,* 668 F.3d 826, 840 (6th Cir. 2012).

The "retaliation" or "discrimination" theory arises from 29 U.S.C. § 2615(a)(2), which states that an employer cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must establish that: (1) he or she was engaged in an activity protected by the FMLA; (2) the employer knew that the plaintiff was exercising his or her rights under the FMLA; (3) after learning of the plaintiff's exercise of

FMLA rights, the employer took an adverse employment action against him or her; and (4) there was a causal connection between the plaintiff's protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir. 2012); *Killian v. Yorozu Auto. Tenn., Inc.,* 454 F.3d 549, 556 (6th Cir. 2006).

The Sixth Circuit applies the Title VII burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973) to both FMLA interference and retaliation claims.

### 5.        Hostile Work Environment

An employee may establish a violation of Title VII by proving that discrimination based on his membership in a protected group has created a hostile or abusive work environment. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U. S. 57, 66, 106 S. Ct. 2399, 91 L. Ed 2d 49 (1986). In order for racial harassment to be actionable, it must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S. Ct. 2399. "The theory of a hostile environment claim is that the cumulative effect of the ongoing harassment is abusive." *Hafford v. Seidner*, 183 F. 3d 506, 514-15 (6th Cir 1999).

To establish a prima facie hostile work environment case based on race under Title VII the Plaintiff must establish that: (1) He is a member of a protected class; (2) He was subjected to unwelcome harassment; (3) The harassment was based on his race; (4) The harassment had the effect of unreasonably interfering with his work performance by creating a hostile, offensive or intimidating work environment; and (5) There is employer liability. *Id*. at 512.

To satisfy the fourth element, Plaintiff must show that the conduct to which he was subjected was severe or pervasive enough to create an environment that a reasonable person

would find hostile or abusive or and that the victim subjectively regarded it as abusive. *Smith v. Leggett*, 220 F. 3d 752, 760 (6th Cir. 2000). The court must consider the totality of the circumstances in that a hostile work environment is comprised of a "succession of harassing acts, each of which 'may not be actionable on its own.'" *Clay v. United Parcel Service, Inc.*, 501 F. 3d 695, 708 (6th Cir 2007). While it is true that the court must consider acts of harassment directed against other employees of the Plaintiff's protected class, Plaintiff's knowledge of those act is not necessarily sufficient to establish a hostile work environment. *Hawkins v. Anheuser Busch* 517 F. 3d 321, 336 (6th Cir 2008).

Plaintiffs assert a combination of factors that they submit establish the existence of a hostile work environment and an intent to discriminate against African American. The lynchpin to Plaintiffs' argument is a statement made by department supervisor, Dennis Cook, in 2010 wherein he declared a department initiative "to change the face of Provider enrollment." Plaintiffs contend at that time the department consisted of approximately 70% African Americans and following a period of disparate treatment and mass termination the percentage of African American employees dropped to about 30%.

It is well established that direct evidence, is evidence which, if believed requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action. *Jacklyn v. Schering – Plough Health Care Products Sales Corp*., 176 F. 3d 921, 926 (6th Cir. 1999). Direct evidence establishes the existence of a fact without any inferences or presumptions. *Norbuta v. Loctite Corp.*, 181 F. 3d 102 (6th Cir. 1999); *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F. 3d 1078, 1081 (6th Cir. 1994)(evidence that requires the jury to infer a fact is not direct evidence).

6.      **Retaliation**

An employer may not retaliate against an employee because he has opposed an unlawful employment practice, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. 42 U.S.C. § 2000e-3(a). A prima facie case of retaliation requires a plaintiff to demonstrate that: (1) He or she engaged in a protected activity; (2) Defendant knew that Plaintiff was exercising protected rights; (3) Plaintiff suffered an adverse employment action or was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) There was a causal connection between the protected activity and the adverse employment action or harassment. *Little v. BP Exploration and Oil Co.,* 265 F.3d 357, 363 (6th Cir. 2001); *Morris v. Oldham Co. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000).

### 7. Pretext

If the plaintiff is able to establish a prima facie case, a mandatory presumption of discrimination is created and the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. If the defendant carries this burden, the plaintiff must then prove that the proffered reason was actually pretextual. The plaintiff may establish pretext by showing that, (1) the stated reasons had no basis in fact; (2) the stated reasons were not the actual reasons; or (3) the stated reasons were insufficient to explain the defendant's action. *Id. See also, Cicero v. Borg-Warner Automotive, Inc.*, 280 F.3d 579, 589 (6th Cir. 2002). "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

### B. The Case At Bar

### 1. Hostile Work Environment Claims

The parties disagree on whether Plaintiffs Brooks, Coleman and Britton have asserted a

claim for hostile work environment discrimination. Docket No. 87-1, p. 3, 93, 97, and 99. These Plaintiffs contend they have stated a claim for hostile work environment discrimination while Defendant asserts they have not. Plaintiffs argue in addition that evidence of a hostile work environment provides context and supports the other claims asserted including those regarding their terminations. Reviewing the allegations of the complaint as well as the submissions of the parties the court concludes that these Plaintiffs did not assert a separate claim for hostile environment discrimination and even if they did it would not withstand Defendant's Motion for Summary Judgement.

The Complaint asserts various facts on behalf of each of the individual Plaintiffs. It then states a series of averments entitled "collective allegations" which discuss workplace conduct Plaintiffs allege created a hostile work environment. However, none of the allegations asserted in the "collective allegations" relates specifically to these individual plaintiffs. Further, the "claims" section of the Complaint does not assert a "claim" related to hostile work environment for these Plaintiffs.

The phrase "to change the face" is not direct evidence of unlawful discrimination. The phrase is used in many contexts which are not explicitly racial. Undoubtedly anyone hearing such a statement in an employment context could perceive it was directed specifically at them for any number of reasons. For the reasons described more fully regarding the claims of the individual Plaintiffs, the statement is of little significance to the claims asserted.

While the Plaintiffs assert "collective allegations" regarding what they regard as disparate treatment within the department, the only adverse employment action about which they specifically complain is their terminations. Otherwise, they have failed to assert a hostile work environment had the effect of unreasonably interfering with their work performance. Similarly,

the fact that each of the Plaintiffs was subjected to counseling and disciplinary action regarding the very issues for which they were terminated years prior to the existence of the alleged hostile work environment and statement by Mr. Cook there is no evidence from which they could prevail on a hostile work environment claim beyond their knowledge of alleged harassment directed against other employees.

While Plaintiffs' allegations and arguments regarding the treatment of others is clearly relevant on the issue of intent and to provide context for their asserted claims, for the reasons discussed herein with respect to each individual Plaintiff's claims, there is insufficient evidence that would support a hostile work environment claim on behalf of those Plaintiffs that they experienced a hostile work environment.

### 2. Camille Britton

Ms. Britton asserts claims of race discrimination under 42 U.S.C. § 1981 and the Tennessee Human Rights Act ("THRA") as well as retaliation under the Family and Medical Leave Act ("FMLA").[2]

Each of Plaintiff's claims fail because she cannot establish facts from which a jury could find that the asserted reason for her termination was pretext. Plaintiff has a well-established pattern and history of attendance problems during her employment with Defendant. She was counseled and disciplined by Defendant eleven different times by five different managers. She was issued a final written warning four separate times, placed on a Performance Improvement Plan and suspended all prior to her termination. She was granted intermittent FMLA leave on various occasions and allowed to modify her work schedule multiple times in order to address

---

2 In her response to the Motion for Summary Judgment, Britton asserts a claim of interference with her rights under the FMLA for denial of leave on November 3, 2011. Because Plaintiff did not assert a claim for interference in her complaint or allege any facts related to the interference claim therein, the court will not consider it as a stand alone claim.

her attendance issues. It is undisputed that immediately prior to her termination on November 4, 2011, she received a final written warning advising that she could be subject to termination for further violations. It is likewise undisputed that on November 3, 2011, regarding the attendance issue resulting in her termination she sent her supervisor the following email:

> Will you please clock me in at 9:10? My Kronos was locked out this morning. I also called you because I was caught in traffic on the exit ramp.

The Defendant's factual basis for the decision to terminate is her history of attendance issues and the incident on November 3, 2011 following the final written warning. Plaintiff has failed to establish the existence of any comparators similarly situated in all relevant respects. While Plaintiff points to employees outside her protected category who also had attendance issues, none of the alleged comparators' attendance issues are comparable in frequency and severity. Finally, based upon Ms. Britton's own admission in her email that she was late because of traffic there is insufficient evidence from which a jury could find that her termination was in retaliation for her prior exercise of FMLA.

As noted above, Plaintiffs' collective allegations regarding the alleged hostile work environment while relevant to the analysis of Ms. Britton's claims are not dispositive and clearly insufficient to establish pretext in light of the above analysis. Camille Britton's issues with attendance existed and were the subject of counselings and other disciplinary action long before the existence of the alleged hostile work environment in 2010. She does not assert that the decision maker in her termination made any inappropriate statements, comments or jokes to her or anyone else in her presence based on race. Mistreatment of other employees even if discriminatory does not excuse the Plaintiff from compliance with an employer's legitimate policies regarding attendance. For these reasons, Defendant's Motion for Summary Judgment as to Ms. Britton is GRANTED.

3.      **Pamela Brooks**

Plaintiff Brooks submits claims of race discrimination under Title VII, 42 U. S. C. § 1981 and the THRA related to her termination. Defendant asserts it is entitled to summary judgment because Plaintiff cannot establish that the reason for her termination was pretext. The court agrees.

Brooks was counseled by three different managers on multiple occasions regarding her leadership and judgment as well as her interaction with other employees. She was disciplined five times receiving two verbal warnings, a written warning, two final written warnings and a three day suspension. She was ultimately terminated for showing a lack of leadership and appropriate judgment related to her inappropriate communications with team members and others.

In support of her contention that the asserted reason for her termination is pretextual Ms. Brooks notes that the asserted reasons are entirely subjective and disputes the characterization that her conduct was inappropriate and would support termination. Secondly, she contends that she was treated differently from her white coworkers in many ways including enforcement of the dress code and surveillance of her communications with the other employees.

While an employer's reliance on purely subjective criteria must necessarily be subject to greater scrutiny courts have repeatedly held that subjective criteria is a sufficient basis upon which to make such a decision. *Scott v. Eastman Chemical, Co.,* 275 F. Appx. 466, 476 (6th Cir. 2008). Similarly, courts are cautioned when considering proffered reasons not to "act [] as a 'super personnel department," overseeing and second guessing employers' business decisions." *Bender v. Hecht's Department Stores*, 455 F. 3d 612, 627 (6th Cir. 2006).

It also well-established courts must not substitute their judgment for that of the employer

but must look to whether the employer has an honest belief in its proffered reason for discharging the employee even if that belief is ultimately incorrect. The criteria for application of the honest belief rule are clear. A plaintiff is required to show "more than a dispute over the facts upon which the discharge was based." *Braithwaite v. Timken. Co.*, 258 F. 3d 488, 493-94 (6th Cir. 2001). The key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action. *Smith v. Chrysler Corp.*, 155 F. 3d 799, 807 (6th Cir. 1998). As long as the employer held an honest belief in its proffered reason, "the employee cannot established pretext even if the employer's reason is ultimately founds to be mistaken, foolish, trivial or baseless." *Smith*, 155 F. 3d at 806; *see also Majewki v. Automatic Data Processing Inc.*, 274 F. 3d 1106, 1117 (6th Cir. 2001).

While it is not unexpected that Ms. Brooks would disagree with the Defendant's assessment of her conduct, she acknowledges the history and record of counseling and disciplinary actions she received regarding the conduct for which her employment was ultimately terminated. In light of this documented conduct and discipline by multiple management officials over a significant course of time, Defendant has established its honest belief in the facts upon which the decision was made to terminate Ms. Brooks.

While Plaintiff asserts she was treated differently from her white coworkers in many ways that support her discrimination claims she has failed to identify any similarly situated employee who engaged in similar behavior, who had a similar record of disciplinary action and was not terminated. As with the other Plaintiffs, evidence of the alleged treatment of other employees while relevant is not dispositive to her claim. There is a record of counseling and disciplinary action regarding the issues for which Ms. Brooks was terminated prior to the alleged existence of a hostile work environment in 2010.  Ms. Brooks denies she was subjected to any

racially hostile or derogatory comments and in any event, for the reasons stated above, cannot establish that Defendant's decision to terminate her employment was pretextual therefore, Defendant's Motion for Summary Judgment as to Ms. Brooks is GRANTED.

**4.    Demetrius Coleman**

Defendant has moved for summary judgment on Plaintiff Coleman's claims of retaliation under the Tennessee Public Protection Act ("TPPA") and Tennessee Common Law as well as her claims for discrimination under Title VII, 42 U. S. C. § 1981 and the THRA. For the reasons stated herein, Defendant's Motion is GRANTED.

As an initial matter, Defendant contends that the doctrine of judicial estoppel bars Coleman's race and retaliation claims because she did not disclose the claims in her bankruptcy petition filed on December 29, 2011. Plaintiff responds that because her bankruptcy petition was dismissed requiring her to pay her creditors in full, she has not derived an unfair advantage by her failure to disclose the existence of these claims in her bankruptcy petition and should not be barred from proceeding in this matter. The Court agrees with the Plaintiff.

It is undisputed that the Plaintiff had a duty to disclose these claims in her bankruptcy petition and failed to do so. *Bohanan v. Bridgestone/Firestone North American Tire, LLC*, 2007 WL 1091209 at *3 (M. D. Tenn, April 10, 2007). It is likewise undisputed that Plaintiff never made any attempt to amend her bankruptcy petition in order to disclose the claims. While these facts generally support application of the doctrine of judicial estoppel they are not ultimately dispositive of its application. Ultimately, the key to determining the propriety of judicial estoppel in this circumstance is "whether the party seeking to assert an inconsistent positon would derive an unfair advantage or impose unfair detriment on an opposing party if not estopped." *New Hampshire v. Maine*, 532 U. S. 742, 751, 121 S. Ct. 1808, 149 L. Ed 2d 968 (2001).

An example would be where a party files a bankruptcy petition and has a plan adopted that offers relief to the party by eliminating or reducing the obligation owed to a creditor. In such a circumstance the party would receive a windfall if successful in the litigation because of the reduction or elimination of the debt. Here however, Plaintiff has and will receive no windfall as a result of failing to disclose the claim because the bankruptcy has been dismissed and the plaintiff did not receive an elimination or reduction of any of her debts. Because Plaintiff did not receive a windfall as a result of her inconsistent position the Court finds that the doctrine of judicial estoppel should not apply in this case.

To show a claim under the Tennessee Public Protection Act ("TPPA") a claimant must establish the following four elements: (1) The plaintiff was an employee of the defendant; (2) The plaintiff refused to participate in, or remain silent about, illegal activity; (3) The defendant/employer discharged or terminated the plaintiff's employment; (4) The defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate or remain silent about the illegal activity. *Webb v. Nashville Area Habitat for Humanity, Inc.,* 346 S. W. 3d 422, 437 (Tenn. 2011).

To prevail on a claim of common law retaliatory discharge, an employee must prove (1) that an at will employment relationship existed between the employee and the employer; (2) that the employee was discharged; (3) that the employee was discharged for attempting to exercise a statutory or constitutional right, or for any other reason that violates a clear public policy; and (4) that such action was a substantial factor in the employer's decision to discharge the employee. See *Guy v. Mutual of Omaha Insurance Company,* 79 S. W. 3d 528, 535 (Tenn. 2002). Thus, the primary difference between the statutory whistleblower claim and a common law whistleblower claim is that, to benefit from statutory protection, an employee must demonstrate that his or her

refusal was the sole reason for his or her discharge. T. C. A. § 50-1-304 (a); *Guy v. Mutual of Omaha Insurance Company*, 79 S. W. 3d at 535-537.

The TPPA statutorily requires the application of the *McDonnell-Douglas* burden shifting framework to claims accruing on or after June 11, 2011. See T. C. A. 50-1-304(g); *Williams v. City of Burns*, 465 S. W. 3d 96, 111-12 (Tenn. 2015). Courts also routinely apply the McDonnell-Douglas framework to common law retaliatory discharge claims. *See e. g. Riddle v. First Tennessee Bank, National Assoc*., 497 Fed Appx. 588, 598 (6th Cir. 2012).

Generally, a claim of retaliatory discharge presents the employee with the challenge of proving the employer's motivation for the firing. *Guy v. Mutual of Omaha Insurance Company*, 79 S. W. 3d at 524. In these cases, direct evidence of an employer's motivation is rarely available to the employee. *Guy v. Mutual of Omaha Insurance Company, supra* at 534; *Mason v. Seaton,* 942 S. W. 2d 470, 474 (Tenn. 1997). Thus the Court must determine at summary judgment whether there is evidence showing circumstances under which a reasonable person could infer retaliatory motive for the discharge. *Mason v. Seaton,* 942 S. W. 2d 473. The critical element often is whether the employee can prove a causal relationship between the employee's whistleblowing activity and the termination of employment.

With respect to the claims under both the TPPA and Tennessee Common Law for retaliatory discharge, Plaintiff cannot establish a prima facie case. It is undisputed that Plaintiff never reported her complaint with the Ethics and Compliance Department to the individual who made the decision to terminate her employment, Shirley Roberts. As a result, she cannot establish that the decision maker was aware of her protected activity and therefore cannot establish a causal connection between the protected activity and the adverse employment action. For these reasons, Plaintiff's claim for TPPA and common law retaliatory discharge is dismissed.

With respect to the other claims asserted, Defendant contends that Ms. Coleman was terminated "because of her disruptive and unprofessional behavior in the workplace." Plaintiff responds this proffered reason is pretext and that genuine material issues of fact preclude summary judgment. Specifically, she denies the allegations that she was "disruptive and unprofessional, asserts that Caucasian employees engaged in similar conduct without termination and that the evidence regarding the treatment of other non-Caucasian employees support this contention. For the reasons stated herein, the Defendant's motion is GRANTED.

It is undisputed that Ms. Coleman's alleged lack of professionalism was well documented over several years by multiple members of management. Ms. Coleman admitted that she was perceived by other employees as loud, argumentative and confrontational. It is likewise undisputed that Ms. Coleman was the subject of complaints by other employees regarding her behavior which were confirmed by the Human Resources Department. Ms. Coleman's history of counseling and disciplinary actions, complaints from other employees and admission that her conduct could be perceived as unprofessional all belie her contention that the proffered reason for her termination was pretextual. While Plaintiff asserts that several Caucasian employees engaged in disruptive and unprofessional workplace behavior towards managers and coworkers not resulting in termination, she has failed to show that those individuals were similarly situated in all relevant respects. Plaintiff's arguments in this regard are conclusory and fail to identify the specific nature of the conduct as well as any pattern or history of conduct equivalent to that of Ms. Coleman. Therefore, the comparators are not legally relevant. Finally, evidence regarding the alleged hostile work environment while relevant, is not dispositive. Ms. Coleman has a history of documented counselings and disciplinary action by multiple members of management prior to the existence of the alleged hostile work environment in 2010. Further she admits that

she is unaware of any racially derogatory or negative comments made by any manager, supervisor or director and does not identify any specific race based harassment she experienced. The allegations regarding the treatment of other minority employees are insufficient to establish that the reason asserted for Plaintiff's termination was pretextual. For the reasons stated herein, Defendant's Motion for Summary Judgment as to Ms. Coleman is GRANTED.

**5**.    **Delano Porchia**

Defendant moves for summary judgment with respect to Plaintiff Porchia's claims for race discrimination and retaliation under 42 U. S. C. § 1981 and the THRA. Plaintiff contends that there are disputed issues of material fact and therefore summary judgment is inappropriate. For the reasons stated herein, Defendant's Motion is GRANTED.

As an initial matter Defendant asserts that Porchia's claims are barred by the equitable doctrine of judicial estoppel. As with Defendant Coleman, Plaintiff filed a bankruptcy petition wherein he failed to list this action as an asset of the estate, he further failed to supplement his petition to add these claims. Ultimately, however, Mr. Porchia's bankruptcy was dismissed. Because he did not obtain relief under the bankruptcy code resulting in the elimination or reduction of any of his debts, his failure to list this claim does not result in a windfall to him. Therefore, the court declines to apply judicial estoppel to this claim and Defendant's motion in this regard is DENIED.

Defendant asserts that Plaintiff was terminated because of "his failure to meet reasonable performance expectations." Plaintiff argues that there are disputed facts regarding the issue of pretext. He disputes that he was having problems with productivity or meeting performance expectations, and states that multiple white employees with "subpar objective performance and productivity" were not terminated and the discriminatory acts toward other black employees in

the department are further evidence of pretext.

Plaintiff initially worked for Defendant as a Credentialing Specialist from 2007 to 2008. During this time, he reported to an African American manager who documented concerns with his work quality and productivity. After voluntarily leaving employment for a period of time. Plaintiff was rehired in 2009. Again reporting to a different African American manager, issues with his work quality and productivity were noted resulting in his placement on a Performance Improvement Plan in 2009. In 2010, he began reporting to Shirley Roberts who likewise determined his performance was below company standards. Roberts addressed her concerns with Plaintiff on occasions in 2010 and 2011. On March 15, 2012, Roberts issued Plaintiff a written warning and three day suspension for continuing to work below the department's productivity and quality standards and once again placed him on a Performance Improvement Plan ("PIP"). After Plaintiff failed to meet the goals and objectives of the PIP he was terminated.

Plaintiff's claims of a hostile work environment are not supported by the evidence. He simply does not assert any conduct that is sufficiently severe or pervasive that would support any claim for a hostile work environment.

With respect to his arguments on pretext, it is undisputed that Plaintiff was counseled multiple times, disciplined and placed on improvement plans during his tenure with the company by different managers, two of whom were African American. While Porchia contends that there were white employees with subpar objective performance and productivity issues he offers no factual basis to support his belief or from which the court could determine they were similarly situated. His reference to acts against other black employees in the department are relevant but not dispositive. Plaintiff has a history of documented counseling and discipline regarding the issues which ultimately led to his termination. These actions occurred well before the existence

of the alleged hostile work environment in 2010. His failure to establish that the asserted reason for his termination is pretextual is fatal to his claims that his termination was discriminatory or retaliatory.

With respect to Porchia's claim of retaliation, his admission that he did not complain to anyone that he was discriminated against while employed by Defendant is fatal. Because he cannot establish that he engaged in a protected activity he likewise cannot establish that the decision maker was aware of his participation in a protected activity and the adverse employment action was caused by his participation. For these reasons, the Plaintiff has failed to establish a prime facie case of retaliation and this claim must be dismissed.

## CONCLUSION

For the reasons stated herein, Defendant's Motions for Summary Judgment are GRANTED.

An appropriate Order will follow.

**Jeffery S. Frensley**
**U. S. Magistrate Judge**